[Civ. No. 19442.   Second Dist., Div. Two.   Nov. 13, 1953.]

LILLIE CHALFIN, Appellant, v. IRVING CHALFIN, Respondent.

Hahn, Ross & Saunders for Appellant.

Gralla & Gralla, Henry O. Wackerbarth and Isador Gralla for Respondent.

MOORE, P. J.—This appeal does not involve erroneous rulings, insufficiency of the findings to support the judgment, or insufficiency of the evidence to uphold the findings. Neither prejudicial error in the admission or rejection of proof is asserted, nor is the form of the judgment under attack. Appellant declares that her "appeal is concerned with what transpired during the course of the trial which led to a purported settlement of all issues before the court, except of course, the one issue of divorce which was decided in favor of appellant without contest."

Appellant had sued for divorce on the ground of extreme cruelty. A cross-complaint was filed on the same ground. The court proceeded with the trial and developed from appellant evidence that her husband had struck her with his fist, used vile and abusive language toward her, left her alone when she was ill, consorted with strange women, pushed her down with a box mattress, and other cruelties. ▮ Near the close of the day, after the court became satisfied that a reconciliation was not probable, the judge indulged in some observations on the situation as it then appeared and attempted to make suggestions that the property of the parties should be agreeably divided by them and avoid a long, protracted trial of charges and countercharges that could effect no good to either of them but would reflect upon their children. He deprecated appellant's demand for $225 a month for food bills; said the mother of two small children could not maintain a four-bedroom home on the amount of alimony he could conscientiously award; that the home should be sold; that if she takes the home she should be paid alimony for a very short period; that these are something to think about "until tomorrow morning. See what you can work out gentlemen."

## A TENTATIVE SETTLEMENT

On the following day after appellant's testimony as to residence had been corroborated, the court inquired about the property settlement. Appellant's counsel having stated that they had reached a tentative settlement, respondent's attorney detailed that the community property consisted of the home, a 1949 Oldsmobile subject to a litigated lien for

$1,100, household furniture and a half interest in the Pacific Athletic Company. But appellant objected when the same attorney proceeded to suggest that appellant should have the home, the automobile and all the furniture but one of the two king-size beds, a poker table, a freezer and a movie camera and projector. The house was to be sold, pending which respondent was to pay all its expenses including the hire of the gardener. Out of the proceeds from the sale of the home for $37,500 more than its mortgage of $13,000, appellant should receive $25,000; if sold for less than $37,500, her share was to be reduced proportionately with a minimum of $22,500, respondent to pay the deficit. Appellant thereupon voiced her opposition to all of it. The court, addressing appellant's counsel, then stated that any agreement "to be made here in lieu of dragging out all of the ghosts of the past by way of a settlement will have to be agreed on by your client, by both parties of their own free will. I don't want to force anybody into anything."

The court admonished appellant's attorney to explain to her the proposed settlement again and again and also to her brother and to say to them that the court considered it a very fair settlement. The lawyer then stated that it is satisfactory except for a few little details. The court stated, "the court doesn't want to be a party to any stipulation and you attorneys don't want to be a party to any stipulation or any agreement in which both parties are not thoroughly conversant with the terms thereof. And Mrs. Chalfin, if you are of the opinion that you do not understand it or you can't agree to it, I am not going to force you to do anything." To that appellant replied that she did not know the terms until she heard them just read in open court. "You see, I feel I should have known or gone over it a little bit beforehand." Her lawyer thereupon stated that he called her the night before and explained it to her; also, he had just explained it to her in the hall. "She is a sick woman but I think the settlement is fair and there should be a determination of this case. Her doctor thinks as long as the case is pending she is suffering from a neurosis . . . I was going to suggest that we enter the stipulation and Mr. Gralla and I . . . reduce the terms to writing and present them to both parties for signature."

"THE COURT: Well, that might be all right, Mr. Zeman, as far as doing that is concerned. Mr. Gralla has stated here in substance what the terms are but I would want Mrs.

Chalfin to not only read it over but under oath in open court state that she has read the agreement, she understands it, and it is satisfactory to her and she signed it of her own free will, without any force or threats, or violence of any kind, because there is no sense in having anyone sign an agreement and then subsequently a couple of weeks later find out that it is not agreeable to them, and then turn around and attempt to break it. Well, let me ask you this, Mrs. Chalfin. Do you think if these attorneys submit this agreement in writing to you by way of a property settlement agreement, and submit it to you by tomorrow morning—I don't know whether you can get it out tonight or not—that you can come back tomorrow morning? . . . Now, you have your own brother here in court and he knows that no one is trying to put anything over on you and you can talk with him tonight and come back tomorrow morning and just have the property settlement agreement drawn up. Come back tomorrow morning. Now, pull yourself together in the meantime. . . . Mrs. Chalfin, your brother has been here in court now and he has heard these terms explained by Mr. Gralla and I know that Mr. Zeman has talked to him about it and you talked with him. And you have got to make up your mind whether or not you want to do this . . .''

When court convened on the following day, Mr. Gralla stated that respondent had met appellant's objections to the agreement as theretofore proposed by a provision that appellant should have all the household furniture, the freezer, $25,000 out of the proceeds of the sale of the home regardless of its sale price; also, he will pay her $4,000 ''as additional payment in full settlement of all property rights . . . and the wife is waiving all rights to alimony and support.'' Thereupon, in response to the court's inquiry appellant stated that the agreement was satisfactory. In addition, the court ordered payment in two equal installments of $150 a month as support for the two children.

### The Court's Language

At the beginning of the last discussion of the settlement, some points of disagreement appeared to be about to disrupt the hoped-for harmony when appellant's counsel demanded that the $4,000 be termed ''alimony.''

''The Court: Well, I will be very frank with you. If it is left up to the court and you are going to leave it as alimony, I won't give her any near figure like $25,000 out

of that house. I wouldn't give her anything like it. I would give her about $15,000.

"MR. HERTZBERG: Well, I don't think the court has heard all the facts and if you want to go to trial as to the value of this business——

"THE COURT: We are going to go to trial. I am not going to sit by here and have all these curves thrown from one side and then the other. There is only one thing to do, we are going to hear this thing out, every single witness, every piece of evidence, everything.

"MR. GRALLA: Very well, sir.

"THE COURT: It might end up with your client losing the case and not getting anything."

Following the foregoing colloquy, the court ordered the trial to proceed whereupon a recess was ordered in the following language:

"THE COURT: All right, we'll take a recess until 10:30 gentlemen. If you haven't something settled by that time there is only one thing to do. We will go ahead and hear all the evidence."

After the recess, a general discussion ensued in which details were agreed to and both parties assented to the terms included in the settlement.

THE COURT'S CONDUCT NOT PREJUDICIAL

It should be constantly borne in mind by the judiciary that it behooves every trial judge to listen, hear and from the evidence determine the issues raised by the pleadings; to maintain an orderly procedure; to be patient with litigants and counsel; to be not only fair but to appear to be fair and to be sympathetic towards any litigant or witness attempting to impress the merits of his cause or the sincerity of his testimony; and to maintain an open mind until the cause is submitted.

While the foregoing ethical concepts serve generally as the guiding rules for a high-minded jurist, yet it does not follow that their religious application is indicated in every situation. Controversies are legion which the litigants consider of first impression but with the issues of which the trial judge is familiarly conversant. The case at bar did not involve strange or novel questions of fact or of law. Upon the court's having gained a knowledge of appellant's oppressions at the hands of respondent, of her requirements, of the unlikelihood of a reconciliation, of the nature of the community property, it behooved the judge to submit the adjustment of their property

rights to the parties and their counsel. He was impelled to do so for the reasons that the lawyers knew intimately the circumstances of each item of the community property and its significance or value to the parties. Also, from the attempts by appellant's counsel he had discovered the latter's aim to becloud respondent's name with accusations that could not be established but which could be of enduring embarrassment if not ignominy to him and his children. For these reasons the judge wisely conceived that if the parties could conclude a property settlement, the controversy might be terminated without the expenditure of days in a trial.

As a suggestion for the guidance of counsel in their conferences concerning an agreement, the court suggested the demands of appellant for food allowance as extravagant. Such observation was based upon practical experience and its wisdom is not doubted. The statement that if appellant gets the home the period of her alimony would be confined to a brief period was for the benefit of counsel. The home was the largest single item of their property. It would be worth much to appellant whereas respondent's business was a holding in a partnership which would be dissolved by a transfer of his interest to another. Also, the preservation of the *status quo* with his partner would enable respondent to support his children.

Complaint is made that the court partially prejudged appellant's physical condition by saying that she was a healthy woman. There had been no intimation that the little woman had suffered any constitutional or hereditary weakness or that she had been deprived of her powers or talents by reason of respondent's behavior. Her contention that the court's observation as to her physical condition was a ''partial prejudgment of her personal financial requirements,'' is to ignore a judge's knowledge of her allegations as well as of the fundamentals of life. Whatever her financial ''requirements'' might be they were to be satisfied out of the community estate. Naturally, if proof should be made of a diseased physical condition not hitherto mentioned, the brevity of the alimony term would be exchanged for a longer period. But the court's admonitions were aimed to assist the lawyers in reaching an agreement.

When the stipulation as to a division was announced, appellant registered her objection or approval to each item. In practically every instance where she protested, the language used was changed to accord with her wishes. Her counsel

repeatedly approved the settlement and stated to the court that he had explained the settlement "to the whole family last night" and he considered it fair while no objection came from them. The court reiterated in his colloquies with counsel that the agreement was for the parties and the lawyers to make. "I am not going to force you to do anything."

When the final draft of the agreement had been drawn, it had the cordial approval of appellant's counsel as well as of members of her own family. She accepted it and the court approved.

From the initial proposal that appellant take $25,000 out of the home as her share with the understanding that such sum would be proportionately reduced by the percentage of the reduction of the sale price below $37,500 over and above the mortgage of $13,000, she constantly gained in the negotiations until, upon her insistence, she was to receive $25,000 net, whatever the sale price might be. Also, she received *all* the furniture. In fact, she left the conference with an agreement whereby she was to have substantially all the property accumulated during their marriage. While respondent was to retain his partnership interests in the Pacific Athletic Company, appellant never once intimated that she would prefer it to the furniture, the $29,000 and support for her children. It appears to have been the consensus (1) that respondent should continue with his business and (2) that it was worth less than the amount awarded appellant. From such facts it is clear that appellant suffered no prejudice by reason of the statements of the court. If she received a fair settlement, whatever might have been the language of the court, she cannot have a reversal merely by reason of her displeasure at the conduct of the judge.

### Not Compelled by the Court

Appellant argues that even though her counsel advised her to accept the settlement, they "had no other choice in view of the foregoing," referring to the quoted statements of the judge. The answers thereto are: (1) She insisted upon her own demands for a larger share until they were met; (2) she was assured repeatedly that she should make no settlement unless she chose to do so of her own free will; (3) she was attended by her own attorney, a capable and honorable lawyer, at every stage of the proceeding and he visited with her and her family in the evening and explained to her why the settlement proposed should be consummated; and (4)

notwithstanding the advice of her counsel she held out for the last farthing.

The position assumed by the judge did not deprive her of her day in court. The court never forbade appellant to introduce pertinent and competent evidence either of her husband's cruelties or of their joint property or of the needs of the children. No question of what the community property embraced was ever raised. In fact not an error is assigned with reference to the court's refusal to hear any evidence. But after she had exacted a net $25,000 out of the proceeds to be received from the home, she and her counsel joined in accepting the settlement. Thus, she was not coerced by the court.

## AUTHORITIES

While the authorities cited by appellant for the purpose of showing the court erred to her prejudice contain some language favorable to her contention, an examination of them reveals no factual situation akin to those at bar. In *Pratt* v. *Pratt,* 141 Cal. 247 [74 P. 742], the trial judge excluded relevant and competent testimony against which he confessed a prejudice. In *Webber* v. *Webber,* 33 Cal.2d 153 [199 P.2d 934], the judge, in the course of trial, indicated his unfriendliness to the allowance of alimony and after he had divided the community estate of $50 between the spouses, he refused to award any alimony to the wife, notwithstanding she had been married 37 years, had reared eight children and was without power or talent to earn a livelihood. Also, the Supreme Court was displeased because the judge referred to the trial as the "washing of dirty linen," there having been no vices or immoralities charged. Again in *Rosenfield* v. *Vosper,* 45 Cal.App.2d 365 [114 P.2d 29], clearly the trial judge committed reversible error in advising defendant to settle for $7,500. The latter had in his answer denied the value of the services exceeded $1,000. The plaintiff had originally alleged their value to be $5,605; two weeks later he filed his amended complaint alleging their value to be $10,000. This was controverted with the same language used in the first answer. Without having heard any witness for defendant, the trial judge had advised the defendant to pay $7,500. Other amended complaints were successively filed, progressively increasing his demand until he finally alleged the value of his services to be $18,000. The latter allegation appears to have controlled the court in its award to the plaintiff.

In the case at bar, nothing was said by the judge to indicate a partiality for, or a prejudice against either party. The fact is that he announced his adherence to a policy of not granting alimony payments for long periods. Such statement is reasonably interpreted to mean that the payment of alimony over extended periods is not to be required except where the needs of the recipient and the circumstances of the parties render it imperative. It does not essentially indicate an inimical attitude toward the law requiring the payment of alimony to a needy spouse.

The approval of the settlement by appellant and her counsel put an end to the controversy. (*Adams* v. *Adams,* 29 Cal.2d 621, 624 [177 P.2d 265].) Since the record discloses that she suffered no substantial prejudice in the settlement (*Slavich* v. *Slavich,* 108 Cal.App.2d 451, 459 [239 P.2d 100]), and no showing is made that a different forum would yield a nearer approach to justice, a second attempt would be a vain undertaking.

The judgment is affirmed.

McComb, J., and Fox, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 11, 1954.